**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────────

VICTORIA MUNN,

                              Plaintiff,

        v.                                              No. 06-CV-231
                                                          (LEK/DRH)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

─────────────────────────────────────

**APPEARANCES:**                        **OF COUNSEL:**

ERWIN, McCANE & DALY                    THOMAS C. ERWIN, ESQ.
Attorney for Plaintiff
23 Elk Street
Albany, New York 12207

HON. GLENN T. SUDDABY                   WILLIAM H. PEASE, ESQ.
United States Attorney for the          Assistant United States Attorney
    Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**


**REPORT-RECOMMENDATION AND ORDER**[1]

        Plaintiff Victoria Munn ("Munn") brought this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

Munn moves for a finding of disability and the Commissioner cross-moves for a

─────────────────────────

        [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

judgment on the pleadings.  Docket Nos. 14, 15.  For the reasons which follow, it is recommended that the Commissioner's decision be remanded.

## I. Procedural History

On October 10, 2001, Munn filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq.  T. 85-87.  That application was denied on April 23, 2002.  T. 26-31.  Munn requested a hearing before an administrative law judge ("ALJ"), which was held before ALJ Carl Stephan on April 30, 2003.  T. 32, 321-33.  In a decision dated May 29, 2003,  the ALJ held that Munn was not entitled to disability benefits.  T. 44-55.  On May 30, 2003, Munn filed a request for review with the Appeals Council.  T. 56-61.  The Appeals Council granted Munn's request for review on July 29, 2004 and remanded the action back to the ALJ for reconsideration.  T. 70-71.  A supplemental hearing was held before ALJ Stephan on December 9, 2004 where a vocational expert offered testimony.  T. 333-54.  In a decision dated December 17, 2004, the ALJ again held that Munn was not entitled to disability benefits.  T. 13-25.  After another timely request was submitted to the Appeals Council on December 17, 2004, the Council denied the request, thus making the ALJ's findings the final decision of the Commissioner.  T. 5-8.  This action followed.

## II. Contentions

Munn contends that the ALJ erred when he failed to (a) find her physical or mental impairments, either alone or in combination, of sufficient severity to constitute a

listed condition, (2) evaluate properly the nature of Munn's fibromyalgia claim, (3)

assess properly Munn's credibility concerning her statements of pain and disability, and

(4) support his decision that Munn was disabled with substantial evidence in the record.

The Commissioner contends that there was substantial evidence to support the

determination that Munn was not disabled.


### III. Facts

Munn is currently twenty-nine years old and completed high school as well as

two years of college.  T. 24, 54, 324.  Munn has previously worked as a customer

service representative, computer service representative, bank teller, and office

assistant.  T. 120-26, 106.  Munn alleges that she became disabled on August 21, 2001

due to obesity, musculoskeletal pain in her joints, depression, anxiety, and

agoraphobia.  Docket No.14 at 6, 13.[2]


### IV.  Standard of Review

#### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . .

---

[2] Originally, Munn alleged disability due to obesity, asthma, anxiety, panic attacks, depression, chronic fatigue, and fibromyalgia.  Docket No. 14 at 6.  In the ALJ's May 29, 2003 decision, he concluded that of the initially claimed impairments, Munn's fibromyalgia, depression, anxiety, panic attacks, and asthma constituted severe impairments.  Id. at 10.  Currently, Munn does not allege that her asthma is disabling but does allege that she is suffering from bipolar disorder, which does not appear to have been diagnosed or substantially discussed at Munn's hearings.  Id. at 13.  Thus, the discussion herein addresses only Munn's musculoskeletal ailments and her depression, anxiety, and agoraphobia.

benefit. . . ." 42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment . . . which has lasted or can be expected to last for a

continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically

determinable impairment is an affliction that is so severe that it renders an individual

unable to continue with his or her previous work or any other employment that may be

available to him or her based upon age, education, and work experience.  Id. §

423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical

and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the

impairment is "based [upon] objective medical facts, diagnoses or medical opinions

inferable from [the] facts, subjective complaints of pain or disability, and educational

background, age, and work experience."  Ventura v. Barnhart, No. -4 Civ. 9018(NRB),

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d

1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he [or she] is not, the
> [Commissioner] next considers whether the claimant has a 'severe
> impairment' which significantly limits his [or her] physical or mental ability
> to do basic work activities.  If the claimant suffers such an impairment, the
> third inquiry is whether, based solely on medical evidence, the claimant
> has an impairment which is listed in Appendix 1 of the regulations.  If the
> claimant has such an impairment, the [Commissioner] will consider him [or
> her] disabled without considering vocational factors such as age,
> education, and work experience; the [Commissioner] presumes that a
> claimant who is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe

4

impairment, he [or she] has the residual functional capacity to perform his [or her] past work.  Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the

5

Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.


## V.  Discussion

### A. Medical Evidence

Munn alleges that she became disabled on August 21, 2001 due to a combination of physical and mental ailments.  T. 16.  Munn has not engaged in any substantial gainful activity after that date.  Id.  She did attempt to return to work, acting as an administrative assistant from July 2003 to July 2004, but her medical conditions resulted in her termination from employment.  T. 16, 335.  Thus the latter employment activity "is considered an unsuccessful work attempt."  Id.


### 1. Musculoskeletal Ailments

In December 2000, Munn presented to her treating physician, Dr. Caulfield, complaining of knee and hip pain.  T. 196.  Upon examination it was noted that her knee was unremarkable and that she probably suffered from benign arthralgia,[3]  Id.  On April 4, 2001, Munn advised Dr. Caulfield that she believed she was suffering from ankylosing spondylitis.[4]  T. 189.  Dr. Caulfield ordered a full work-up with x-rays taken of

---

[3] Arthralgia is joint pain.  DORLAND'S ILLUSTRATED MED. DICTIONARY 140 (28th ed. 1994) [hereinafter "DORLAND'S"].
[4] Ankylosing spondylitis is "the form of rheumatoid arthritis that affects the spine."  Id. at 1563.

6

Munn's knees and back as well as laboratory work for arthritis.  Id.  All of the diagnostic tests were negative and Dr. Caulfield noted that he "[d]oubt[ed] significant ankylosing at this time . . . ."  Id.  However, it was clear that Munn was in pain.  Id.  Thus, Caulfield recommended that Munn see a rheumatologist.  Id.

On June 28, 2001, Munn was referred to a rheumatologist, Dr. Mroczkowski.  T. 165-67.  Dr. Mroczkowski noted that Munn's MRIs of her back and head were normal, she displayed no synovitis, and although she transferred positions with pain, her range of motion in her joints and spine were good.  T. 165-66.  Dr. Mroczkowski concluded that Munn probably had fibromyalgia[5] and recommended physical therapy, exercise, and a weight loss regimen to combat Munn's morbid obesity.[6]  T. 167.

Munn then was examined again by Dr. Caulfield.  T. 186.  Dr. Caulfield noted that Munn could climb on and off the examination table without any assistance, was receiving physical therapy for her back, was losing weight, and had an overall good musculoskeletal examination.  Id.  However, on October 3, 2001, Dr. Caulfield noted that Munn returned in a "disabled state."  T. 183.  He stated that her fibromyalgia was severe and rendered her incapable of sitting at work.  Id.  Munn could not tolerate the pain medication that had been provided because the side effects were too intense.  Id.  Despite all of Munn's self-reported ailments, Dr. Caulfield noted that she still retained a good range of motion in her joints.  Id.

---

[5] "Fibromyalgia indicates pain in fibrous tissues, muscles, tendons, ligaments, and other sites . . ." and is "characterized by achy pain, tenderness and stiffness . . . ." THE MERCK MANUAL 481 (17th ed. 1999).

[6] On October 5, 2001, Munn described her height as 5'1" and her weight as 210 pounds.  T. 104.

A few months later, Dr. Caulfiled started Munn on a different pain medication to attempt to alleviate her fibromyalgia.  T. 178.  On January 29, 2002, Munn was seen by Dr. Caulfield and reported that her fibromyalgia had significantly improved and she was feeling "100% better" on the medication.  T. 177.  However, in February 2002, Munn reported that while the fibromyalgia had continued to improve with medication and physical therapy, it was still not fully resolved in her knees.  T. 175.  Dr. Caulfield surmised that Munn had crepitus[7] in her knees, but the examination was otherwise unremarkable.  Id.  By March 13, 2002, Munn had regressed and returned to Dr. Caulfield with "fairly disabling" pain.  T. 174.  Munn stated that she was suffering from knee instability, Ehlers Danlos syndrome[8], shoulder and ankle pain, and spontaneously dislocating joints which she was able to reduce herself.  Id.  Dr. Caulfield noted that there was "moderate deformity" and "hyperextension of both knees."  Id.

On April 8, 2002, Munn was seen by Dr. Paul Hospodar at the Capital Region Orthopedic Group.  T. 271.  Munn complained of knee pain and her Ehlers Danlos syndrome and underwent x-rays.  Id.  Although her knees were hyperextended, the x-rays did not indicate any arthritis.  Id.  Dr. Hospodar recommended that Munn stretch out the tendons in her knees, strengthen her quadriceps, wear knee braces for support,

---

[7] Crepitus is "the grating sensation caused by the rubbing together of the dry synovial surfaces of [the] joints."  Id. at 391.

[8] Ehlers-Danlos syndromes are a group of diseases affecting the binding properties of tissue cells, "including the skin, tendons, muscle, and blood vessels."  Ehlers-Danlos Syndrome, <http://www.medicinenet.com/ehlers-danlos_syndrome/article.htm>.  Munn was diagnosed with the type 3 syndrome which is characterized by joint hypermobility.  Id.  "Any joint can be affected and dislocations are frequent."  Id.  Treatment includes avoidance of joint injuries, bracing, and exercises to strengthen muscles neighboring and supporting the affected joints.  Id.

and return for re-evaluation in six weeks.  Id.

A few days later, Munn had both an orthopedic and internal medicine evaluation with State Examiner, Dr. Esther Sumitra-Albert.  T. 216-19, 221-25.  During the orthopedic examination, Dr. Sumitra-Albert noted that although Munn had stated that she occasionally used a quad-cane for balance over the last five years, she could walk on both her heels and toes without difficulty, fully squat, and change, rise from the chair and mount and dismount the examination table without assistance.  T. 217.  Additionally, Munn was independently able to cook, do laundry, shop, manage money, socialize, shower, and dress.  Id.  Moreover, Sumitra-Albert stated that examinations of Munn's spine, upper extremities, and ankle as well as her fine motor skills and left knee x-rays were unremarkable.  T. 218.

Additionally, during the internal medical examination, Dr. Sumitra-Albert noted that despite Munn's morbid obesity, she had a normal gait and stance.  T. 222.  While Munn had a decreased range of motion due to her knee pain, Dr. Sumitra-Albert noted no gross instability in the joint or any swelling or inflammation.  T. 218.  Moreover, while there was hyperextension of Munn's joints, there was also no evidence of "contractures, ankylosis, or thickening."  T. 223.  Thus, Dr. Sumitra-Albert concluded that Munn had a "minimal limitation with prolonged walking, standing, climbing, bending, and kneeling [and that h]er obesity [will] likely aggravate these symptoms."  T. 219, 223.

On April 23, 2002, Munn also underwent a Physical Residual Functional Capacity (RFC) Assessment with Dr. Pratt.  T. 230-41.  Dr. Pratt stated that Munn's vague descriptions of her expected limitations were "not credible based on the medical evidence" because despite the hyperextendability in her joints,  the results of the

9

diagnostic testing was unremarkable and she retained a normal gait.  T. 235, 231.  Dr.

Pratt determined that Munn's exertional limitations included occassionally lifting twenty

pounds, frequently lifting ten pounds, standing or walking for a total of six hours and

sitting for a total of six hours out of the workday, and only occasionally being able to

climb, balance, stoop, kneel, crouch, and crawl.  T. 231.  Additionally, due to her

asthma, it was suggested that Munn avoid exposure to fumes, odors, dusts, gases, and

poor ventilation.  T. 234.

On May 23, 2002, Munn visited Dr. Merkhan, who stated that she had

deteriorated to the point that discussing options such as disability and long-term pain

regimens were appropriate.  T. 267.  During a follow-up appointment on November 14,

2002, Dr. Merkhan suggested that Munn be referred to a pain management clinic as

physical therapy, chiropractic therapy, and pain medications were not working.  T. 260.

Munn returned to the orthopaedic group on December 5, 2002.  T. 259.  The

orthopaedist concluded that Munn was not adequately responding to the pain

medication.  Id.

However, during a follow-up appointment with Dr. Caulfield on May 28, 2003, he

noted that Munn did not appear in distress and he was unsure what to do for Munn as

she had been discharged from the pain management program because there was little

they could offer Munn and she had exhausted every other "usual formula[]" prescribed

for similarly situated patients suffering from chronic pain.  T. 289.  Additionally, during

the follow-up with the orthopaedic group on June 3, 2003, it was noted that there was

no instability in Munn's knee and that the ligament laxity in her knee was a life-long

problem that could not be surgically corrected.  T. 281.  It was recommended that Munn

10

continue with her physical therapy, strengthening exercises, and bracing.  Id.  A follow-up with Dr. Caulfield on July 28, 2003 yielded similar results with recommendations to continue bracing the knee.  T. 288.

During the final administrative hearing on April 30, 2003, Munn testified that she had extreme pain in her hips and knees, could not stand or sit for more than twenty minutes at a time, and became very fatigued during the course of the day.  T. 326. While she then used only over-the-counter pain medication, it was because the side effects of the prescription medication were too severe and further aggravating her underlying medical conditions.  T. 330.  Munn estimated that because of her medical conditions, she spent an average of two days a week confined to her bed.  T. 341.


### 2. Mental Disorders

Munn has been diagnosed with depression, anxiety, and obsessive compulsive disorder ("OCD").  On December13, 2000, Munn had a follow-up appointment with Dr. Caulfield to determine whether the medication he had earlier prescribed for her anxiety was helping.  T. 196.  Upon examination, Dr. Caulfield noted that Munn was doing extremely well on the medication and it was successfully alleviating her anxiety and OCD symptoms.  Id.  The medication continued to work well until Munn began suffering from elevated pain from her fibromyalgia in October 2001.  T. 186, 183.

On October 25, 2001, Munn underwent her first psychiatric examination with Dr. John Seltenreich.  T. 169-72.  Dr. Seltenreich noted that while Munn described feelings of "some guilt, fatigue,[and] mild concentration problems," she denied any

agoraphobia[9], suicidal intentions, or symptoms associated with mania or cognitive defects.  T. 169-70.  Additionally, she was appropriately dressed with normal behavior, spoke clearly, and had a coherent thought process; however, her "affect was dysphoric[10] and her mood was . . . anxious and depressed."  T. 170.  Dr. Seltenreich surmised that Munn was of average-to-high intelligence, clear senses, proper orientation, and fair insight and judgment.  T. 171.  He also noted that Mun was able to dress, bathe, and groom herself, cook, and drive on a limited basis.  Id.  Dr. Seltenreich concluded that while Munn "may have some mild problems maintaining attention and concentration for tasks . . . [and] dealing [with workplace] stress," she could consistently and independently perform simple tasks, learn new tasks, make appropriate decisions, and relate with others.  Id.  Thus, Dr. Seltenreich recommended that Munn "might benefit from some psychiatric care and counseling[11] . . ." and that she would be able to work subject primarily to her physical health status.  Id.

In January and February, 2002, Munn had follow-up appointments with Dr. Caulfield regarding her anxiety and OCD.  T. 177, 175.  Dr. Caulfield noted that both the OCD and panic attacks were being controlled effectively by medication.  Id.  On

---

[9] Agoraphobia is an "intense, irrational fear of open spaces, characterized by marked fear of being alone or of being in public places where escape would be difficult or help might be unavailable."  DORLAND'S 38.

[10] A dysphoric attitude is one which is manifested by "disquiet, restlessness, [and] malaise."  Id. 517.

[11] Munn did not participate in in-patient or continuous, ongoing treatment by a psychiatrist, psychologist or mental health counselor for her symptoms of depression, panic disorder or OCD.  T. 21, 52.  Munn stated that she saw a therapist in the Fall of 2002 for depression, but she was instructed that as long as she remained on her medication, there was no need for ongoing therapy.  T. 327.  Thus, Munn has received the majority of her psychiatric care from her primary care giver.

12

February 24, 2002, Munn underwent a mental RFC assessment with Dr. James

Nalpert.  T. 238-55.  Dr. Nalpert concluded that Munn had no limitations concerning

understanding or memory and only moderate limitations with the ability to complete a

normal work week without interruptions, perform at a consistent pace without rest

periods, and set realistic goals and make plans independently.  T. 238-39.  Additionally,

Dr. Nalpert stated that while Munn had no episodes of decompensation, she had mild

limitations in activities of daily living and social functioning.  T. 252.  She was diagnosed

with major depression-mild and OCD, neither of which was sufficiently severe to

"precisely satisfy the diagnostic criteria . . . ."  T. 245, 47, 252.  During a follow-up with

Dr. Caulfield a few weeks later, it was again noted how successfully the medication was

treating Munn's mental health ailments.  T. 174.

      On April 11, 2002, Munn underwent her second psychiatric examination with Dr.

Annette Payne.  T. 212-25.  Dr. Payne noted that Munn had not been involved in any

outpatient psychiatric treatment and, while she had experienced problems with her

OCD, it had been under control with medication as she had not had an attack in three

to four months.  T. 212, 213.  Additionally, Munn indicated that she was having

problems with depression, weight gain, and fatigue but denied any suicidal intentions,

did not have any manic symptoms, and lacked any evidence of a thought disorder or

cognitive defect.  T. 213.  Dr. Payne indicated that Munn had difficulty with attention,

concentration, and memory attributed to her emotionality, had cognitive function in the

average range, was capable of self-care, shopping, and doing laundry, and assisted

with the cleaning and cooking.  T. 214.  Dr. Payne surmised that Munn could follow and

understand simple directions, perform simple and complex tasks, and learn new tasks

despite her difficulty with attention, concentration, persistence, pace, and dealing with workplace stresses.  Id.  Dr. Payne diagnosed Munn with mild panic disorder with agoraphobia and stated that "[h]er psychiatric difficulties [we]re mildly to moderately limiting," and that she would "definitely benefit from regular counseling and psychotropic medications."  T. 214, 215.  Additionally, Dr. Payne concluded that Munn had a fair prognosis and, with vocational assistance, could still work despite her medical limitations.  T. 215.

Munn had three appointments with Dr. Merkhan during the Fall and Winter of 2002.  T. 263, 260, 256.  Dr. Merkhan initially stated that Munn's depression and anxiety were not under control, but by November 14, 2002, the anxiety, panic, and depression were improving with medication.  T. 260.  However, in December, Dr. Merkhan noted that there was recently an increase in Munn's depression and that the symptoms had worsened slightly.  T. 259.

By Munn's follow-up appointment with Dr. Caulfield on March 26, 2003, she was doing "exceedingly well," on her medication and had had "[n]o more anxiety episodes at all."  This finding was reiterated at Munn's following four appointments with various physicians.  T. 288, 303, 286, 301, 257, 285, 300.  The first indication that the medication needed adjustment was on March 4, 2004 when Munn complained of headaches, but her symptoms indicated that she had sinusitis and Munn was prescribed antibiotics.  T. 283, 298.

**B. Severity**

Munn contends that the ALJ failed properly to assess the severity of her conditions.  The Commissioner contends that the ALJ properly evaluated the severity of Munn's impairments.

As mentioned above, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities.  See subsection IV(A) supra; 20 C.F.R. § 404.1521(a) (2003).  Where a claimant alleges multiple impairments, a court will consider "the combined effect of all [] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  Id. § 404.1523.  An impairment, or combination thereof, is not severe if it does not impinge on one's "abilities and aptitudes necessary to do most jobs."  Id. § 404.1521.  Basic work activities which are relevant for evaluating the severity of a physical impairment include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. . . ."  Id. § 404.1521(b)(1).

 "The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability."  DeChirico, 134 F.3d at 1180; see also 20 C.F.R. § 404.1520(d) (2003); Id. at pt. 404, subpt. P. App. 1 (2003)(listing of per se disabling ailments).  Additionally, the regulations state that "if an individual has an impairment that is 'equal to' a listed impairment," that individual is disabled regardless of his or her age, education, or work experience.  DeChirico, 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

Munn contends that her obesity, fibromyalgia, musculoskeletal pain, and mental illness, standing alone or in combination, constituted a disabling condition per se. Munn's musculoskeletal joint pain and instability are governed by the section on muscoskeletal loss of function.  20 C.F.R. pt. 404, subpt. P, App. 1.00 (2003). Munn's depression, anxiety, and OCD are governed by the section on mental disorders.  20 C.F.R. pt. 404, subpt. P, App. 12.00 (2003).

Munn contends that her knee ailments are encompassed within the listed impairments of § 1.00.  Joint injuries qualify as a listed impairment when the individual suffers from a "gross anatomical deformity," including instability, and chronic joint pain with either the inability to ambulate effectively per 20 C.F.R. pt.404, subpt. P, App. 1.00(B)(2)(b) or the inability to perform fine and gross motor skills per 1.00(B)(2)(c). The inability to ambulate effectively is established by showing such things as the claimant (a) cannot travel or carry out routine daily activities without assistance, (b) must use assistive devices, or (c) is unable to walk a city block.  Id. at App. 1.00(B)(2)(b)(2).  The inability to perform fine and gross motor skills requires a "loss of function" and "capab[ility] of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living."  Id. at App. 1.00(B)(2)(c).  Examples include making meals, feeding oneself, and performing daily hygienic activities.  Id.

There is no dispute that Munn suffers from instability and chronic joint pain in her knee.  However, she remains able to ambulate effectively.  Munn has repeatedly testified that she is able to complete daily activities independently, such as cooking, doing laundry, shopping, socializing with family and friends, showering, dressing, and

16

occasionally driving.  T. 171, 217.  Additionally, during appointments, Munn was able to

squat, rise from the chair, change her clothing, and mount and dismount the

examination table without assistance.  T. 213, 217, 222, 231.  Moreover, while Munn

has a cane, it is not a necessary assistive device because she testified that she only

used it occasionally.  T.217.  Furthermore, Munn's knee injury had not resulted in any

motor deficiencies as she was still generally able to attend to her daily personal needs

without assistance.  Therefore, Munn has not demonstrated that her joint ailments are

sufficiently  severe to be classified as a listed impairment.

Munn also contends that her depression, anxiety, and OCD should be classified

as a disability per se based either on § 12.04[12] or § 12.06.[13]  Under § 12.04, a plaintiff

must demonstrate that he or she is suffering from either (1) one of four depressive

syndromes, three manic syndromes or a bipolar system with at least two marked

restrictions or difficulties or (2) a

> medically documented history of chronic affective disorder . .
> . with symptoms . . . currently attenuated by medication and .
> . . one of the following; (1) [r]epeated episodes of
> decompensation . . ; (2) [a] residual disease process that
> [would] . . . cause the individual to decompensate; or (3)
> [c]urrent history of one or more years' inability to function
> outside a highly supportive living arrangement . . . .

Id.  Depressive symptoms include "[a]ppetite disturbance with change in weight . . ,

[s]leep disturbance . . , [d]ecreased energy . . . , [f]eelings of guilt . . , [and d]ifficulty

concentrating or thinking . . . ."  Id. at 12.04(A)(1).  Marked restrictions or difficulties

---

[12] This section concerns affective disorders which are characterized by mood
disturbances.  20 C.F.R. pt. 404, subpt. P, App. 12.04 (2003).
[13] This section concerns anxiety-related disorders.  20 C.F.R. pt. 404, subpt. P,
App. 12.06 (2003).

include (1) restrictions in daily activities, (2) difficulty with socialization and function, (3) marked inability to maintain concentration, or (4) multiple, repeated instances of decompensation.  Id. at 12.04(B).  As there is no evidence in Munn's medical records of any bipolar diagnosis, manic symptoms, episodes of decompensation,[14] or habitation in a highly supportive living arrangement, consideration of Munn's disability per se must be confined to the depressive syndromes and marked restrictions.

Munn has established the first prong of the analysis.  Munn's medical record contains at least four of the depressive symptoms required by the statute as she has had changes in weight, sleep disturbances, decreased energy, feelings of guilt, and difficulty concentrating.  T. 169-70, 213-14.  However, Munn has not demonstrated marked restrictions in her daily activities, ability to socialize, or ability to maintain concentration.  The most generous psychiatric evaluation stated that Munn's mental ailments, at their worst, were "mildly to moderately limiting."  T. 214.  This does not rise to the level of marked impairment necessary to find her disabled per se.  Additionally, Munn has no documented episodes of decompensation.  Thus, she is unable to achieve a disability per se as the listed impairments require both depressive symptoms and marked limitations.

Under § 12.06, the plaintiff must demonstrate an anxiety ailment and either (1) two marked restrictions or difficulties, or (2) the "complete inability to function independently outside one's home.  20 C.F.R. pt. 404, subpt. P, App. 12.06 (2003).  An anxiety ailment is either (1) "[g]eneralized persistent anxiety . . ," (2) "persistent irrational

---

[14]Decompensation is the failure of defense mechanisms resulting in progressive personality disintegration.  DORLAND'S 317.

fear . . . ," (3) "[r]ecurrent severe panic attacks . . .," (4) "[r]ecurrent obsessions or compulsions . . .," or (5) "[r]ecurrent and intrusive recollections of a traumatic experience . . . ."  Id. 12.06(A).  The marked restrictions and difficulties are identical to those required by § 12.04 discussed supra.

Arguably, Munn may be able to satisfy the first prong of the analysis as she has been diagnosed with both anxiety and OCD.  However, her severe panic attacks and recurrent obsessions are no longer recurrent or an object of distress as the medical record is replete with statements that medication is preventing her panic attacks and adequately controlling her OCD.  However, even if Munn could overcome the first prong of the analysis, for the same reasons discussed supra, she is not suffering from any marked limitations to daily activities, social functioning or maintaining concentration.  Additionally, there have been no instances of decompensation or a completely inability to function independently outside her home.  Thus, Munn cannot satisfy the second prong of the statute.

Munn further contends that the combination of her knee ailments and mental illnesses warrants a finding of a severe disability.  Based on the foregoing, however, it is clear that there is substantial evidence in the record to support the ALJ's finding that, although some of the injuries were severe,[15] their combined effect still fails to warrant a conclusion of disability per se.

---

[15] The ALJ determined that Munn's anxiety and depression were severe but that all other impairments did not "have more than a minimal adverse effect on her ability to perform the basic activities of work."  T. 22, 52.

Munn also contends that the ALJ did not properly classify her obesity and fibromyalgia claims.  "Obesity is not in and of itself a disability; [h]owever, [it] may be considered severe -- and thus medically equal to a listed disability – if alone or in combination with another medically determinable . . . impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."  Cruz v. Barnhart, No. 04-CV-9011 (GWG), 2006 WL 1228581, at *10 (S.D.N.Y. May 8, 2006) (citing Soc. Sec. Rul. ("SSR") 02-1p, 67 Fed.Reg. 57859 (Sept. 12, 2002)) (internal quotations omitted).  Additionally, the Second Circuit "ha[s] recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease."  Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (citations and internal quotations omitted).

There appears to be no disagreement over the diagnosis of fibromyalgia. However, the ALJ determined that all musculoskeletal ailments, including her fibromyalgia, in combination with her obesity did not "have more than a minimal adverse effect on her ability to perform basic activities of work."  T. 22, 52.  This contention is not supported by the medical evidence from Munn's treating physician, who stated that the fibromyalgia was "fairly disabling," the physical therapy was not working, and that he was unable to provide any greater pain relief with medication.  T. 174, 260, 289. Additionally, it is belied by Munn's subjective complaints of pain, as discussed infra in subsection V(C).  Therefore, Munn's fibromyalgia, likely aggravated and inflamed by her obesity,[16] is a severe condition having more than a minimal adverse effect on her ability

---

[16] The ALJ attempts to mitigate the severity of Munn's obesity, and its effects on her other medical ailments, by stating that Munn was recommended to participate in

to perform basic work activities.

However, Dr. Caulfield stated that these ailments were "fairly disabling" and not significantly limiting to Munn's ability to perform work and daily activities.  This statement is, at best, ambiguous.  Additionally, it is difficult to reconcile Dr. Caulfield's assessment with Munn's testimony that she was unable to sit for more than twenty minutes at a time and the RFC evaluator's assessment that Munn could stand, walk, and sit for a total of six hours in an eight-hour-workday.  T. 326, 231.  These unresolved contradictions, particularly in light of the treating physician's ambiguous assessment, make it impossible to gauge the actual effect the ailments have on Munn's ability to work as well as the RFC which she retains.  When there is "little to no evidence in the record to determine [a plaintiff's] RFC properly, the ALJ should at least have attempted to contact [the plaintiff's] treating physicians . . . ."  <u>Hopper v. Commissioner of Soc. Sec.</u>, No. 06-CV-38 (LEK/DRH), 2008 WL 724228, at *11 (N.D.N.Y. Mar. 17, 2008).  The same logic should apply when determining the severity of Munn's medical complaints.  Because the record does not indicate that the ALJ attempted to fill these gaps, the case should be remanded on this issue for clarification of the Dr. Caulfield's assessment because "the ALJ failed in his duty to develop the record properly . . . ."  <u>Id.</u>

Accordingly, it is recommended that the Commissioner's findings in this regard be remanded.

_____

weight loss programs and increase her levels of physical activity and did not comply with those orders.  T. 53, 23.  To use this as a basis for denying Munn's claims, "[t]he treatment must be <u>prescribed</u> by a treating source . . , not simply <u>recommended</u>."  SSR 02-1p(14) (emphasis added).  Here, weight loss was never prescribed but was merely recommended.  Thus, Munn's obesity must be considered despite her disregard of multiple recommendations to lose weight.

### C.  Subjective Complaints of Pain

Munn contends that the ALJ's decision to discredit her subjective complaints of pain was in error. The Commissioner contends that the ALJ properly considered Munn's symptoms.

The ALJ determines whether an ailment is an impairment based on a two-part test.  First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003). This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529 (2003).  "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'" Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence.  20 C.F.R. § 404.1529 (2003).  "Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings." Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983)

(citing Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)).  However, "disability

requires more than mere inability to work without pain."  Dumas v. Schweiker, 712 F.2d

1545, 1552 (2d Cir. 1983).  Pain is a subjective concept  "difficult to prove, yet equally

difficult to disprove" and courts should be reluctant to constrain the Commissioner's

ability to evaluate pain.  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  In

the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make

credibility findings."  Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Donato v.

Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983)).  Thus, the ALJ may reject the

claims of disabling pain so long as the ALJ's decision is supported by substantial

evidence.  Aponte v. Sec'y of HHS, 728 F.2d 588, 591 (2d Cir. 1984).

The claimant's credibility and motivation, as well as the medical evidence of

impairment, are used to evaluate the true extent of the alleged pain and the degree to

which it hampers the applicant's ability to engage in substantial gainful employment.

See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must consider

several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (I)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that Munn's allegations of disabling pain were not credible because (1) her activities of daily living did not indicate that she was disabled as she was able to complete them independently, (2) the record was devoid of objective medical evidence illustrating arthritic changes, swelling, spasm, constriction, or any joint abnormalities, (3) she had not complied with orders to lose weight, and (4) she was not on a pain management regimen.  T. 22-23, 53.  The ALJ's credibility determination was flawed.

Although Munn was able to complete many of her activities of daily living, this is insufficient to save the ALJ's improper credibility determination.  First, the ALJ incorrectly relied on the lack of objective medical evidence establishing the presence of Munn's fibromyalgia to diminish her credibility.  See Green-Younger, 335 F.3d at 108-09 (holding that the "absence of swelling joints or other orthopedic and neurologic deficits is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced.") (internal quotations and citations omitted).  Second, Munn's contentions concerning the duration, frequency, and intensity of her pain -- namely, that she could only sit for twenty minutes at a time and was confined to bed a few days a week -- are entitled to legitimacy because they are supported by Dr. Mroczkowski's diagnosis of

24

fibromyalgia and Dr. Caulfield's classification of the fibromyalgia as "partially disabling." See id. at 108 (allowing credence to be granted to plaintiff's subjective complaints of pain because she had been diagnosed with fibromyalgia and the complaints were consistent with symptoms of fibromyalgia).

Third, as discussed supra, recommendations to pursue weight loss are not binding and, thus, Munn's obesity is not viewed as an aggravating factor over which she has control.  Rather, her obesity is an ailment to be considered in combination when determining disability.  Finally,  the fact that Munn was not involved in a pain management plan cannot be held against her as she had attempted to utilize medication but (1) suffered immensely from the side effects of the medication, (2) had been instructed that the pain management clinic did not "have very much to offer her," and (3) has been given every "usual formular[y]" prescribed for pain by her treating physician.  T. 330, 174, 289; see Green-Younger, 335 F.3d at 109 (stating that credibility cannot be diminished by a patient's failure to pursue medications when "the medications were ineffective in alleviating pain . . . .").

Therefore, it is recommended that the Commissioner's determination on this ground be reversed and remanded for reconsideration in light of the matters discussed herein and the additional information to be obtained from Dr. Caulfield.  See subsection (B) supra.


**D. RFC**

Munn contends that substantial evidence does not support the ALJ's findings regarding her RFC.  RFC describes what a claimant is capable of doing despite his or

her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms.  Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945 (2003).  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

Here, the ALJ concluded that Munn's impairments prevented her from performing her past relevant work.  T. 23.  The ALJ found that Munn had the RFC to perform semi-skilled and light or sedentary exertion jobs where she could "lift up to twenty pounds and sit, stand an walk up to six hours each [day] . . . ."  T. 24, 54. Additionally, Munn could only occasionally stoop, crouch, crawl, balance and kneel and was precluded from climbing or working in areas exposed to dust, fumes and chemicals.  Id.  Lastly, the environment would have to be low-stress and allow for occasional problems interacting and relating with others.  Id.

The ALJ's findings may, or may not, be substantially supported depending upon the further questioning of Munn's physicians and development of the record.  As discussed supra in subsection V(B), the ALJ left a gap in the record concerning the severity of Munn's disability and its effect on her RFC.  During the administrative hearing on April 30, 2003, the vocational expert declared that (1) an individual requiring a half-hour break in both the morning and afternoon in addition to the normal workday's

breaks would have a decreased availability of the contemplated employment base. (2) a person requiring one sick day a week would be unemployable, and (3) an individual with all of Munn's alleged ailments would not be eligible for any jobs in either the regional or national economies.  Therefore, if Munn's contentions regarding her employment limitations are true, the vocational expert has already testified that she is unemployable. Furthermore, even if most of Munn's allegations are true, there is still a distinct possibility that a substantial number of jobs will not exist for her in the current economy. Thus, it is recommended that the Commissioner's determination in this regard be remanded.

## E. Remand or Reversal

A reviewing court has the authority to reverse with or without remand.  42 U.S.C. §§ 405(g), 1383(c)(3) (2003).  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  Curry, 209 F.3d at 124. Reversal is appropriate, however, where there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose. Id.; see also Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  Here, the record is unclear regarding whether (1) Munn's fibromyalgia in combination with her other medical impairments is sufficiently severe to constitute a listed impairment, and (2) Munn retains the RFC to work in the national economy.  Accordingly, it is recommended that the decision of the Commissioner be remanded for further proceedings rather than reversed.

## VI. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the decision denying disability benefits be **REMANDED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file

written objections to the foregoing report.  Such objections shall be filed with the Clerk

of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993)

(citing Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 72, 6(a), 6(e).


DATED:  April 4, 2008
        Albany, New York

_David R. Homer_

United States Magistrate Judge

28